Lincoln SMITH, et al., Appellants–
Respondents,

v.

BROWN & WILLIAMSON TOBACCO
CORPORATION, Respondent–
Appellant.

No. SC 92961.

Supreme Court of Missouri,
En Banc.

Sept. 10, 2013.

Rehearing Denied Oct. 29, 2013.

Kenneth B. McClain and Scott B. Hall of Humphrey, Farrington & McClain in Independence, and Susan Ford Robertson and J. Zachary Bickel of The Robertson Law Group, Kansas City, for The Smith.

Jeffrey S. Bucholtz of King & Spalding, Washington, D.C., Bruce D. Ryder of Thompson Coburn LLP, St. Louis, and William L. Durham II of King & Spalding, Atlanta, for Brown & Williamson.

ZEL M. FISCHER, Judge.

The survivors of Barbara Smith ("the Smiths") appeal from a judgment, entered following remand from the court of appeals for retrial solely on the issue of punitive damages,[1] finding Brown & Williamson To-

---

1. Section 537.090, RSMo Supp.2012, "provides that in wrongful death cases 'the mitigating and aggravating circumstances attending the death may be considered by the trier of facts' in assessing damages." *Smith v. Brown & Williamson Tobacco Corp.*, 275 S.W.3d 748, 810 (Mo.App.2008). This Court, in *Call v. Heard*, 925 S.W.2d 840, 847–48 (Mo. banc 1996), "jettisoned the term 'aggravating circumstances damages' for 'punitive damages,' thereby solidifying its holding in *Bennett* [*v. Owens–Corning Fiberglas Corporation*, 896 S.W.2d 464, 466 (Mo. banc 1995)], that aggravating circumstances damages are the

bacco Corporation ("B & W") liable for punitive damages and awarding the Smiths $1.5 million. The Smiths contend that certain evidence admitted by the circuit court was outside the scope of the court of appeals' prior mandate, and the circuit court erred in overruling their motion for new trial on the grounds of juror nondisclosure. B & W cross-appeals contending that the Smiths failed to make a submissible case for punitive damages. This Court ordered transfer after opinion of the court of appeals and, therefore, has jurisdiction. Mo. Const. art. V, sec. 10. The judgment of the circuit court is affirmed.

## Factual Background

Mrs. Smith was born May 13, 1927. In 1944, Mrs. Smith began smoking Kool cigarettes, which were manufactured by B & W. In the early 1980s, Mrs. Smith developed angina. In 1990, a physician informed Mrs. Smith that she had "respiratory trouble" that was the beginning stage of emphysema. After the doctor told her that she was "going to have to quit smoking because it was going to kill her if she didn't," Mrs. Smith quit smoking within the year. Mrs. Smith was diagnosed with lung cancer in 1992. Part of one lung was removed, and Mrs. Smith was apparently cancer free thereafter. On May 12, 2000, Mrs. Smith died from a heart attack at age 73.

In March 2003, Mrs. Smith's survivors sued B & W in Jackson County under the Missouri wrongful death act, § 537.080, RSMo 2000. They asserted claims for negligent design, negligent failure to warn, strict liability product defect, fraudulent concealment, and conspiracy.

Because the Smiths sought an award of punitive damages, trial was bifurcated pursuant to § 510.263, RSMo Supp.2012. In the first stage of trial, the jury returned a verdict for B & W on the fraudulent concealment and conspiracy claims but returned a verdict in favor of the Smiths on the negligent design, negligent failure to warn, and strict liability product defect claims, awarding $2 million in compensatory damages. The jury further found that Mrs. Smith was 75% at fault; accordingly, the trial court reduced the compensatory damages to $500,000. Also in the first stage of trial, the jury found B & W liable for damages for "aggravating circumstances." In the second stage of trial, the jury assessed $20 million in punitive damages. B & W timely appealed from that judgment.

On appeal, the court of appeals affirmed the compensatory damages awarded against B & W on the Smiths' claims for negligent design, negligent failure to warn, and strict product liability. However, it held that, of the three claims upon which the jury returned a verdict in favor of the Smiths, the plaintiffs made a submissible case for punitive damages only on the strict liability product defect claim. *Smith v. Brown & Williamson Tobacco Corp.*, 275 S.W.3d 748, 823 (Mo.App.2008) [hereinafter *Smith I* ]. Because the verdict did not reflect what portion of the punitive damages were related to that claim, the court of appeals reversed the $20 million punitive damages award against B & W and remanded the case for a new jury trial "on the punitive damages as to the strict liability product defect claim only." *Id.*

On remand, the circuit court determined that the issue of punitive damages on the strict liability product defect claim again would be bifurcated. In the first stage,

---

equivalent of punitive damages." *Collins v. Hertenstein*, 90 S.W.3d 87, 96 (Mo.App.2002) (internal quotations omitted). Therefore, to avoid confusion, this opinion refers to the wrongful death act's aggravating circumstances damages as punitive damages.

the jury was to determine if punitive damages were warranted on that claim and, if so, in the second stage, they would assess the amount of the award. The circuit court ruled that the evidence in the first stage of the retrial would be limited to that presented in the original trial. Neither party raises any issue on appeal concerning this evidentiary ruling. However, the circuit court ruled that the parties could present new evidence during the second stage of retrial.

The case was retried, and in the first stage, the jury found B & W liable for punitive damages on the strict liability product defect claim. During the second stage, B & W presented evidence that any punitive damages award would be paid by R.J. Reynolds Tobacco Company, which had acquired the right to manufacture Kools subsequent to the filing of the suit, and argued that R.J. Reynolds did not deserve to be punished with punitive damages. Following the second stage, the jury returned a verdict awarding the Smiths $1.5 million in punitive damages.

### B & W Cross–Appeal

Both of B & W's claims on cross-appeal challenge the circuit court's overruling of its motion for judgment notwithstanding the verdict. B & W claims that the Smiths failed to make a submissible case for punitive damages for strict liability product defect and that the Smiths failed to make a submissible case because their claims are preempted by federal law.

### Standard of Review

██ When reviewing a circuit court's denial of a judgment notwithstanding the

verdict, "[t]his Court must determine whether the plaintiff presented a submissible case by offering evidence to support every element necessary for liability." *Fleshner v. Pepose Vision Institute, P.C.*, 304 S.W.3d 81, 95 (Mo. banc 2010). "Evidence is viewed in the light most favorable to the jury's verdict, giving the plaintiff all reasonable inferences and disregarding all conflicting evidence and inferences." *Id.* "This Court will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion." *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 457 (Mo. banc 2006).

### Submissible Case for Punitive Damages for Strict Liability

██ In its first point on cross-appeal, B & W contends that the circuit court erred in failing to grant a judgment notwithstanding the verdict because the Smiths failed to make a submissible case for punitive damages for strict liability product defect. B & W claims that the Smiths failed to present clear and convincing evidence of aggravating circumstances related to the conduct for which the jury in the original trial found B & W liable for compensatory damages.[2]

██ "A submissible case for punitive damages requires clear and convincing proof that the defendant intentionally acted either by a wanton, willful or outrageous act, or reckless disregard for an act's consequences (from which evil motive is inferred)." *Howard v. City of Kansas City*, 332 S.W.3d 772, 788 (Mo. banc 2011)

---

**2.** B & W also attempts to argue that certain evidence was admitted erroneously during the first stage of trial because it related to claims other than the strict liability product defect claim. It claims that its right to due process was violated by admitting such evidence. B

& W did not raise these claims in the point relied on and, therefore, they are not properly before this Court for review. *See State v. Fuente*, 871 S.W.2d 438, 443 (Mo. banc 1994) ("This Court's review is limited to matters raised in the points relied on.").

(internal quotation marks omitted). Specific to their claim for punitive damages on their strict liability product defect claim, the Smiths had to present clear and convincing evidence that B & W "knew of the defect and danger of the product and, by selling the product, showed complete indifference to or conscious disregard for the safety of others." *Kansas City v. Keene Corp.*, 855 S.W.2d 360, 374 (Mo. banc 1993); *see also Howard*, 332 S.W.3d at 786–88; *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 109–11 (Mo. banc 1996).

In the appeal from the original trial, the court of appeals examined the evidence "to determine whether, as a matter of law, it was sufficient to submit the claim for punitive damages." *Smith I* at 811. It held that the evidence presented at the original trial was sufficient to support a punitive damages award on the strict liability product defect claim. *Id.* at 823. Accordingly, there was "sufficient evidence of conduct tantamount to intentional wrongdoing to submit the issue [of punitive damages] to the jury." *Id.*

B & W has failed to indicate how the evidence presented in the first stage of the trial on remand differed significantly from that presented in the original trial. On remand, the circuit court limited the evidence presented in the first stage of the retrial to evidence that had been presented in the original trial, and the evidence admitted at retrial was almost identical to the original trial. In both trials, Dr. David Burns and Dr. Jeffrey Wigand testified extensively about the defects and dangers inherent in Kool cigarettes.

Dr. Burns testified about B & W's knowledge and conduct regarding the design, manufacture, advertising, and public position it took on the denial that its cigarettes are addictive or cause disease. He explained to the jury that B & W's knowledge of the dangerous and addictive quali-ties of its cigarettes, and its conduct in light of that knowledge, was "one of the largest public health frauds that occurred in the last half century." Dr. Burns stated that B & W's conduct:

> is a very clear example of a tobacco company attempting to sell its products to someone who is already sick, and that product is going to add further harm to that individual who is already sick. So it's a conscious and deliberate effort to increase profits at the expense and injury of the individual who responds to this message.

Dr. Wigand testified that, while he worked at B & W, the company president's favorite saying was "hook'em young, hook'em for life" in reference to nicotine addiction. Dr. Wigand stated that B & W trained him not to write anything down that potentially could be used in litigation, and that an attorney followed him around so that his conversations could be considered privileged. He said that minutes from meetings were changed to remove any information harmful to B & W's interests.

Drs. Burns and Wigand both described the distinctive characteristics of Kool cigarettes, including a high level of nicotine combined with menthol to ameliorate the harshness so that the smoker would be more likely to breathe deeply. Both stated unequivocally that Kool cigarettes, specifically, are defective and unreasonably dangerous. The fact that the doctors made isolated statements in their testimony suggesting that all cigarettes are inherently dangerous and defective does not negate the effect of their Kool-specific testimony.

And, as was the case in the original trial, there was:

> sufficient evidence of conduct tantamount to intentional wrongdoing to sub-

mit the issue to the jury. In the light most favorable to submissibility, [B & W] had an active process of creating controversy regarding the health risks of smoking and planned to dispute every Surgeon General's report, regardless of what it was based upon. Further, [B & W] had policies of preventing harmful information from becoming available to the public and established procedures to ensure negative information did not reach the public. This rises to the level of clear and convincing.

*Id.* at 823. The circuit court did not err in overruling B & W's motion for judgment notwithstanding the verdict because the evidence was again sufficient to support a punitive damages award on the strict liability product defect claim.

### Preemption of Strict Liability Claims

■ In its second point on cross-appeal, B & W contends that the circuit court erred in failing to grant it a judgment notwithstanding the verdict, claiming that the Smiths failed to make a submissible case for punitive damages for strict liability product defect by failing to introduce evidence that Kool cigarettes posed any risks different than the inherent risk in all cigarettes and that such claims are preempted by federal law.

■ The law of the case doctrine bars this claim. "The doctrine of law of the case provides that a previous holding in a case constitutes the law of the case and precludes relitigation of the issue on remand and subsequent appeal." *Walton v. City of Berkeley,* 223 S.W.3d 126, 128–29 (Mo. banc 2007). "The doctrine insures uniformity of decisions, protects the par-

ties' expectations, and promotes judicial economy." *Id.* at 129.

The previous opinion of the court of appeals held that the Smiths' claims related to strict liability product defect and negligent design were not preempted by federal law. *Smith I* at 798–99. The court of appeals also concluded that there was "sufficient evidence to make a submissible case on the claim that [B & W]'s cigarettes were unreasonably dangerous" and that "[t]he evidence presented went beyond a categorical attack on the danger of cigarettes in general" and "demonstrated specific design choices by [B & W] that had the potential to affect Mrs. Smith's health during the time period she smoked." *Id.* at 796. The same evidence that supported that conclusion in the original trial was also presented at the retrial on remand.

### The Smiths' Appeal

The Smiths raise two claims on appeal. First, they claim that the circuit court erred in permitting B & W to present evidence of R.J. Reynolds's conduct after the merger with B & W because such evidence was outside the scope of the mandate in *Smith I.* Second, the Smiths claim that the circuit court erred in overruling their motion for new trial based on alleged juror nondisclosure.

### Scope of the Court of Appeals Mandate

■ In their first point, the Smiths contend that the circuit court erred in allowing B & W to introduce evidence of B & W's "merger" with non-party R.J. Reynolds,[3] as well as evidence of R.J. Reyn-

---

3. The Smiths' use of the term "merger" is a misnomer because the companies did not actually merge. A merger "exists where one corporation is continued and the others are merged in it without the formation of a new

company." *Dodier Realty & Inv. Co. v. St. Louis Nat. Baseball Club,* 361 Mo. 981, 238 S.W.2d 321, 324 (1951) (quotation marks omitted). A merger consists of a combination of companies "whereby one of the constituent

olds's conduct, in the second stage of the retrial. The Smiths argue that the circuit court exceeded the scope of the court of appeals' mandate in allowing B & W to argue that any punitive damages award would be paid by R.J. Reynolds and using evidence of R.J. Reynolds's historical corporate citizenship to mitigate B & W's punitive damages.

In the first stage of the retrial, the jury considered evidence that had been presented at the original trial and determined that punitive damages should be awarded on that claim. During the second stage of retrial, however, the circuit court allowed both the Smiths and B & W to present evidence related to R.J. Reynolds, which had contractually assumed responsibility for B & W's liabilities as part of corporate transactions that occurred while the original trial was pending. B & W defended itself by presenting extensive evidence of R.J. Reynolds's historical corporate citizenship and research and marketing efforts to reduce the negative effects of its products and arguing that any punitive damages award would be paid by R.J. Reynolds rather than B & W.

The Smiths claim that by permitting this evidence and argument to be considered as mitigating evidence during the retrial, the circuit court allowed B & W to effectively substitute defendants and to argue that non-party R.J. Reynolds should not have to pay punitive damages. The Smiths' specific claim is that this evidence and argument violated the court of appeals' mandate.

■■■■■ On remand, all proceedings of the circuit court must be in accordance with the appellate court's mandate. *Frost v. Liberty Mut. Ins. Co.*, 813 S.W.2d 302, 304 (Mo. banc 1991); *see also Assoc. Indus. of Mo. v. Dir. of Revenue*, 918 S.W.2d 780, 782 (Mo. banc 1996). "There are two types of remands: (1) a general remand, which does not provide specific direction and leaves all issues open to consideration in the new trial; and (2) a remand with directions, which requires the trial court to enter a judgment in conformity with the mandate." *State ex rel. St. Charles Cnty. v. Cunningham*, 401 S.W.3d 493, 495 (Mo. banc 2013). The appellate court's mandate, in conjunction with its opinion, serves to instruct the circuit court as to which type of remand has been ordered.

Where a judgment is reversed and remanded with specific directions to enter a particular judgment, the mandate is in the nature of a special power of attorney and must be followed by the trial court without deviation, but the rule is not applicable where a judgment is reversed and remanded for further proceedings in accordance with the opinion because in every case of remand further proceedings should be 'in accordance with the opinion' whether or not that admonition is appended.

*Sebree v. Rosen*, 374 S.W.2d 132, 136 (Mo. 1964) (internal citations omitted); *Murphy*

companies remains in being—absorbing or merging in itself all the other constituent corporations." *Id.* at 325. "A merger is often defined as the absorption of one corporation by another, which retains its name and corporate identity, with the added capital, franchises, and powers of the absorbed corporation, and which remains in business." 19 Am. Jur.2d *Corporations* § 2168 (2013).

In the transaction between B & W and R.J. Reynolds, which occurred while the first case

was pending, B & W transferred its cigarette manufacturing operations to R.J. Reynolds in exchange for 42% of Reynolds American, Inc., the company that owns R.J. Reynolds. B & W thereby stopped manufacturing cigarettes and exists solely to hold ownership of B & W's share of the Reynolds American stock, and it changed its name to Brown & Williamson Holdings, Inc. As part of the deal, R.J. Reynolds assumed responsibility for the existing liabilities of B & W.

*v. Barron*, 286 Mo. 390, 228 S.W. 492, 494–95 (1920). Every remand is made for further proceedings and those proceedings are expected to be "in accordance with the opinion." Therefore, the use of those words "adds nothing." *Murphy*, 228 S.W. at 495. "It is the general rule that unless from an opinion it is apparent finality was intended it will not be implied from it." *Id.* To say that every remand for proceedings consistent with the opinion is a remand with specific directions "would leave this court at a loss to explain the pains to which it has gone to distinguish a simple reversal and a remandment from one with directions." *Id.*

 The type of remand has legal consequence. A general remand leaves all issues not conclusively decided open for consideration at the new trial. *Butcher v. Main*, 426 S.W.2d 356, 358 (Mo.1968). At retrial following a general remand, new evidence may be produced. *Id.* If the additional evidence introduced at the retrial presents a different case from that presented at the original trial to the appellate court, the circuit court "will be bound by the prior decision only so far as the principles of law then declared are applicable to the new state of facts." *Murphy*, 228 S.W. at 495. Moreover, a mandate is controlling only as to issues addressed therein; a lower court is free to act as to other issues.

*Associated Indus.*, 918 S.W.2d at 783. Therefore, if the mandate of the court of appeals in *Smith I* was a general remand, then the parties were free—in the discretion of the circuit court—to present new evidence during the retrial.

 The mandate of the court of appeals, issued January 28, 2009, reads, in relevant part, "Now on this day the judgment is affirmed in part and reversed in part, and the cause is remanded to the Circuit Court of Jackson County for further proceedings, all in accordance with the Opinion of this Court herein delivered." The opinion stated, "[T]he case is remanded to the jury for a new trial on punitive damages as to the strict liability product defect claim only." *Smith I* at 823. Neither the mandate nor the opinion addressed what evidence would be allowed during the retrial. "The words used do not import a direction of specified things, which is necessary to bring the case within the rule concerning reversals and remandments 'with directions.'" *Murphy*, 228 S.W. at 494–95. With regard to ordering a retrial relative to punitive damages, the prior appeal was a general remand.[4]

As the court of appeals instructed in *Smith I*, the circuit court conducted a retrial only as to punitive damages, only on the Smiths' strict liability product defect

---

4. The issues that the court of appeals conclusively determined in the first appeal have all become the law of the case. Following remand, the appellate court's opinion becomes, and so far as the facts are the same remains, " 'the law of the case,' but it is not as to all issues 'res adjudicata.' " *Butcher*, 426 S.W.2d at 358. " 'The law of the case' applies where a general principle of law is declared as applicable to the facts of the case." *Id.* "The general rule is that the decision of an appellate court is the law of the case on all points presented and decided and remains the law of the case throughout all subsequent proceedings, both in the trial and appellate courts, and no question involved and decided in the first appeal of the cause will be considered on a second appeal, and on a retrial should not be considered by the trial court." *Feinstein v. McGuire*, 312 S.W.2d 20, 23 (Mo.1958). "On a second appeal or writ of error on the same facts and pleadings the appellate court will not notice questions determined in the previous decision. All such are res judicata and closed." *Id.* During the first appeal, the court held, among other things, that the Smiths made a submissible case on their strict liability and their negligent design claims for compensatory damages. These holdings became the law of the case, and the parties are bound thereby.

claim, and only against B & W. That is all that the general mandate required. The mandate in *Smith I* did not address—expressly or by implication—the scope of the evidence that would be admissible on remand. Although it may be that B & W sought to mitigate its damages by presenting evidence of R.J. Reynolds's historical corporate citizenship and research and marketing efforts, that did not result in R.J. Reynolds being effectively substituted as the defendant. B & W was undeniably the only defendant on retrial. While evidence concerning R.J. Reynolds's conduct might be of questionable *relevance*, the Smiths have made clear on this appeal that they raise no relevance issue independent of their contention that admission of the R.J. Reynolds evidence exceeded the scope of the mandate.[5]

While *Smith I* specified the claim, the relief, and the defendant that would be the subject of the retrial, it decided only the *submissibility* of the Smiths' claim for punitive damages—an issue that was addressed in the first stage of the bifurcated punitive damages trial. The determination that the Smiths had made a submissible case for punitive damages on their strict liability product defect claim, but not on their negligent failure to warn or negligent design claims, was based on the court of appeals' consideration of only the evidence that the parties submitted in the first stage of the original trial. Significantly, *Smith I* did not address *any* issue concerning the scope of the evidence that had been admitted in the second stage of the original trial, when the jury determined the *amount* of the punitive damages to be awarded against B & W; nor did *Smith I* address any issue concerning the scope of the evidence that might be admissible in a *future* proceeding, if such a proceeding were even to become necessary.

The Smiths emphasize the statement from *Smith I* that "the conduct at issue for th[e] [strict liability product defect] claim is B & W's act of manufacturing or selling defective or unreasonably dangerous cigarettes." *Smith I* at 822. But this statement only specifies the conduct that could give rise to B & W's *liability* for punitive damages—an issue determined in the first stage of retrial. The quoted statement neither expresses nor implies anything concerning the evidence that may properly be considered in determining the amount of punitive damages at retrial. Moreover, case law establishes that evidence concerning a defendant's conduct, beyond the conduct that caused the plaintiff's injuries, may be admissible in mitigation of a punitive damage award, at least in certain circumstances. *Call*, 925 S.W.2d at 849. (stating that the jury may consider aggravating and mitigating circumstances in assessing punitive damages); *Beggs v. Universal C.I.T. Credit Corp.*, 409 S.W.2d 719, 724 (Mo.1966); *see also* 25A C.J.S. *Damages* § 262 (2013). Under this authority, the court of appeals' specification

---

5. Although it does not expressly say so, the mandate in *Smith I* plainly ordered a retrial on punitive damages against a specific party: B & W. Punitive damages may only be awarded against the defendant the jury has found liable for compensatory damages in the first stage of a bifurcated trial, and here, that defendant was plainly B & W. Given that the court of appeals remanded the case for a retrial of punitive damages on a specific claim against a specific defendant, the circuit court could not, on remand, conduct a trial involving issues beyond punitive damages, or in which punitive damages were awarded against another party, or on a different legal basis. *See, e.g., Denny v. Guyton*, 331 Mo. 1115, 57 S.W.2d 415, 417–21 (1932) (holding that where Supreme Court in prior appeal reversed and remanded "for such further proceedings as may be necessary to determine the issue of accounting only," trial court on remand could not consider defendant's new defenses to joint venture and fraud claims determined in first trial).

in *Smith I* of the conduct that supported *liability* for punitive damages did not necessarily dictate the scope of the evidence that could be considered once liability for punitive damages was determined at retrial.

In determining the scope of the *Smith I* mandate, it is also significant that the court of appeals' prior decision expressly refused to address evidentiary issues, even with respect to the *first* stage of the punitive damages trial. In the prior appeal, B & W argued that a variety of evidence admitted in the first stage of trial violated its right to due process, because that evidence "had no nexus to Mrs. Smith's injuries." Appellant's Br. at 59, *Smith v. Brown & Williamson Tobacco Corp.*, 275 S.W.3d 748 (Mo.App. W.D. filed April 28, 2005) (No. WD65542). It is noteworthy that, among other things, B & W challenged the admission of documents generated by British–American Tobacco Company ("BATCo"), a sister corporation of B & W, and by BATCo's lawyers. B & W argued that the BATCo documents were irrelevant, because "*the evidence related to a non-party* located outside of the United States that had no possible connection to Mrs. Smith," and because "[t]here was no evidence linking th[e] document[s] to B & W or anything B & W did or did not do." *Id.* at 62–63. *Smith I* did not resolve this issue. Instead, it held that, "[g]iven the disposition [challenging the submissibility of the Smiths' punitive-damage case], *these points need not be addressed.*" *Smith I* at 823–24 (emphasis added). The court in *Smith I* expressly determined it was unnecessary to address B & W's arguments concerning the admissibility of evidence in the first stage of the original trial because reversal was required for independent reasons and the evidentiary issues might not recur on remand. This rationale applies with even greater force to evidentiary issues concerning the *second*

stage of retrial. When *Smith I* was issued, there was every possibility a second stage might not even be necessary on retrial if the jury failed to find B & W liable for punitive damages in the first stage. Because *Smith I* explicitly refused to decide evidentiary issues concerning the *first* stage of the original trial, there is simply no basis to conclude that it decided—explicitly or implicitly—evidentiary issues concerning any *second* stage of the retrial.

■ Prior to the original trial, B & W filed a motion *in limine* seeking to exclude evidence concerning R.J. Reynolds, which the circuit court sustained. The Smiths did not oppose the motion, and neither party sought to introduce evidence of R.J. Reynolds's conduct during the trial itself. "A ruling in limine is interlocutory only and is subject to change during the course of the trial. The motion in limine, in and of itself, preserves nothing for appeal." *State v. Purlee*, 839 S.W.2d 584, 592 (Mo. banc 1992). Because neither party attempted to introduce evidence concerning R.J. Reynolds's conduct during the original trial, the circuit court did not actually "exclude" any evidence or finally decide the admissibility issue—such evidence was simply *not offered.* The issue, therefore, could not have been raised in the appeal that led to the *Smith I* decision.

Consistent with the court of appeals' mandate, the trial that occurred on remand was limited to the Smiths' strict liability product defect claim and determined only B & W's liability for punitive damages and the amount of punitive damages to be awarded against B & W; claims were not asserted, or tried, against any other party, on any other legal theory, or seeking any other form of relief. The verdict director in the first stage of the bifurcated punitive-damages retrial plainly focused the jury on whether *B & W* should

be held liable for punitive damages. The verdict director in the first stage, Instruction No. 8, provided:

> If you believe:
>
> First, at the time defendant Brown & Williamson Tobacco Corporation sold the cigarettes *the defendant knew* of the defective condition and danger of the cigarettes, which was found by the first jury as described in paragraph 2 of instruction number 7, and
>
> Second, *defendant thereby showed* complete indifference to or conscious disregard for the safety of others,
>
> Then, in Verdict A, you may find *that defendant Brown & Williamson Tobacco Corporation is liable* for damages for aggravating circumstances.
>
> If you find that defendant Brown & Williamson Tobacco Corporation is liable for damages for aggravating circumstances in this stage of the trial, you will be given further instructions for assessing the amount of damages for aggravating circumstances in the second stage of the trial.

(Emphasis added).

In its verdict, the jury found "that *defendant Brown & Williamson Tobacco Corporation* is liable for damages for aggravating circumstances." (Emphasis added). Similarly, in the second stage of the trial, the court instructed the jury that,

> [i]n addition to the compensatory damages awarded by the jury in the previous trial, you may assess an additional amount as damages for aggravating circumstances in such sum as you believe will serve *to punish defendant Brown & Williamson Tobacco Corporation* for the conduct for which you found that defendant Brown & Williamson Tobacco Corporation is liable for damages for aggravating circumstances and will serve *to deter defendant Brown & Williamson*

*Tobacco Corporation* and others from like conduct.

(Emphasis added). The jury's verdict states that "[w]e, the undersigned jurors, assess damages for aggravating circumstances *against defendant Brown & Williamson Tobacco Corporation* at $1.5 million." (Emphasis added). Consistent with the mandate in *Smith I,* and with the jury's verdicts in the two stages of the punitive damages retrial, judgment was entered against B & W only. The circuit court's judgment states, "**IT IS THEREFORE ORDERED AND ADJUDGED** that judgment is entered for damages for aggravating circumstances in favor of [the Smiths] and *against Defendant Brown & Williamson Tobacco Corporation* in the amount of One Million Five Hundred Thousand Dollars ($1,500,000.00)." (Italics added).

■ The Smiths argue that by allowing this evidence and argument related to R.J. Reynolds to be used as mitigating evidence in the retrial, the circuit court allowed B & W to *effectively substitute defendants* and argue that non-party R.J. Reynolds should not have to pay punitive damages. But R.J. Reynolds did not become "the defendant" when this case was retried, even though B & W sought to capitalize on its relationship to R.J. Reynolds to mitigate its punitive damages exposure. No substitution of parties occurred; B & W remained the defendant throughout. B & W was simply permitted to present evidence and argue that B & W should receive the benefit of R.J. Reynolds's conduct and such conduct should be considered in mitigation of the punitive damages to which B & W would otherwise be subject. While B & W *"defended itself"* by presenting evidence of R.J. Reynolds's historical corporate citizenship and research and marketing efforts, this did

not result in an "effective substitution" of parties.

■ Separate and apart from the scope of the prior mandate, there may be a legitimate issue regarding whether evidence of R.J. Reynolds's conduct is *relevant* to the determination of the amount of punitive damages to which B & W should be subjected (although the issue is complicated by the fact that R.J. Reynolds is affiliated with B & W, is the current manufacturer of Kool cigarettes, and has assumed B & W's liability for any judgment in this case). *See Call,* 925 S.W.2d at 849–50; *Maugh v. Chrysler Corp.,* 818 S.W.2d 658, 662–64 (Mo.App.1991). Even if this Court's review of the trial record suggested the Smiths made a proper relevance objection and preserved it throughout trial, the Smiths did not present this issue to the court of appeals prior to transfer or to this Court. In fact, the Smiths have *expressly disclaimed* any general relevance argument, stating in their reply brief to this Court that "**[t]he relevant issue before this court is not whether the trial court abused its discretion in admitting particular evidence. Instead, it is whether the trial court exceeded its jurisdiction in interpreting the scope of the appellate court's prior mandate and limited remand . . . .**" (Emphasis added). The Smiths have, therefore, abandoned that issue on this appeal, even if this Court was to presume it was preserved throughout the retrial. Rule 84.13 ("[A]llegations of error not briefed or not properly briefed shall not be considered in any civil appeal. . . ."); Rule 83.08(b) ("The substitute brief . . . shall include all claims the party desires this Court to review. . . ."); *see also State v. Brookshire,* 325 S.W.2d 497, 500 (Mo.1959) ("The questions for decision on appeal are those stated in the points

relied on, and a question not there presented will be considered to be abandoned on appeal and no longer an issue in the case.").

It is perhaps strategic advocacy that, rather than generally arguing that the circuit court abused its discretion in admitting irrelevant evidence of post-injury conduct to mitigate punitive damages, the Smiths have instead chosen to limit their argument to the claim that the circuit court committed legal error, reviewable *de novo,* by admitting evidence that was outside the scope of the mandate in *Smith I.* But the Smiths' attempt to re-characterize the issue as a legal question subject to a favorable standard of review does not permit this Court to ignore the fact that *Smith I* was a general remand.

### Juror Nondisclosure

In their second point on appeal, the Smiths argue that the circuit court erred in overruling their motion for new trial based on alleged juror nondisclosure. In their motion for new trial, the Smiths alleged that "several jurors held strong biases against and predetermined views of tobacco litigation" and "did not disclose these biases and prejudices during voir dire." The motion for a new trial also alleged that several jurors "believed that tobacco litigation was frivolous but did not disclose such opinions during jury selection despite clear questions that should have prompted a response."

At a post-trial hearing, the Smiths focused on proving that Juror M had failed to disclose 1) that his mother had a lung condition called chronic obstructive pulmonary disorder (COPD), and 2) that he held a predetermined view that the Smiths' lawsuit was frivolous.[6] The Smiths first called

---

6. The Smiths also attempted to present evidence that one other juror held a predeter-

mined view that the Smiths' lawsuit was friv-

Juror T to testify about statements Juror M allegedly made during the course of the trial. B & W objected to the testimony on the grounds that it was juror testimony offered to impeach the verdict and hearsay. The circuit court sustained the objection. The Smiths then called Juror M to testify. Juror M testified that he did not think the lawsuit was frivolous during voir dire. He testified that he thought the case was interesting and that he never expressed the view that the case was frivolous outside the jury room. The circuit court sustained B & W's objections to questions about whether Juror M said the case was frivolous during deliberations. The Smiths also questioned Juror M about whether he knew his mother had died of COPD. B & W objected, claiming that the Smiths had failed to specifically allege this issue in their motion for new trial. The circuit court sustained the objection.

The Smiths were permitted to make an offer of proof from each juror. Juror M testified during the offer of proof that he did not realize his mother had died of COPD until he looked at the death certificate after trial. Prior to that, he was under the impression that she had died of pancreatic cancer, for which she had undergone surgery. He testified that, while he knew his mother "didn't breathe well," he did not know at the time of the trial that she had a lung problem. He also stated that his mother was overweight. During the offer of proof, Juror T testified that Juror M had expressed, outside of deliberations, his belief that the Smiths' suit was frivolous and that his mother had COPD. Juror T could not remember when Juror M made these statements. Juror T also testified that Juror M did not say that smoking caused his mother's COPD.

On appeal, the Smiths allege a number of errors in connection with the circuit court's handling of the motion for new trial relative to juror nondisclosure. First, they allege that the circuit court erred when it found the Smiths failed to properly allege Juror M's failure to disclose his mother's COPD in the motion for new trial. Second, the Smiths argue that the circuit court erred when it ruled that evidence supporting that claim was inadmissible. Third, the Smiths allege that the circuit court erred in excluding the testimony in relation to their contention that Juror M failed to disclose that he thought their case was frivolous during voir dire.

### Standard of Review

 "This Court will not disturb a trial court's ruling on a motion for new trial based on juror misconduct unless the trial court abused its discretion." *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 86–87 (Mo. banc 2010). A circuit court abuses its discretion when its ruling "is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* at 87.

 A party alleging juror misconduct during voir dire must present evidence to substantiate its allegations. *State v. Mayes*, 63 S.W.3d 615, 625 (Mo. banc 2001). The movant bears the burden of proving any allegations made in a motion for new trial. *Id.* When making factual determinations a circuit court is free to disbelieve any, all, or none of the evidence. *White v. Dir. of Revenue*, 321 S.W.3d 298, 308 (Mo. banc 2010). "Where the trial court makes no specific findings of fact, the reviewing court must assume that all facts were found in accordance with the result reached." *State v. Revels*, 13 S.W.3d 293, 297 (Mo. banc 2000). "Appel-

olous. The Smiths do not raise any issues related to the second juror in this Court.

late courts defer to the trial court on factual issues 'because it is in a better position not only to judge the credibility of witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record.'" *White,* 321 S.W.3d at 308–09.

### Juror M's Failure to Disclose his Mother's Illness

This Court must first decide whether the Smiths properly alleged Juror M's nondisclosure of his mother's COPD in the motion for new trial. Rule 78.07(a) provides that, in a motion for new trial, "[a]llegations of error based on matters occurring or becoming known after final submission to the court or jury shall be stated specifically." "General allegations of error not based upon specific objection or requests made during trial are insufficient to preserve the allegations for review; nor may deficiencies in the motion be supplied from the movant's brief on appeal." *Williams ex rel. Wilford v. Barnes Hosp.,* 736 S.W.2d 33, 36 (Mo. banc 1987). Although an allegation of error may be general in a motion for a new trial when definite objections or requests were made during trial, an allegation of error must be sufficiently definite to direct the court's attention to the particular acts or ruling asserted to be erroneous. *Beard v. Ry. Express Agency, Inc.,* 323 S.W.2d 732, 745 (Mo.1959) (finding that a request for new trial "because of the character of the arguments" was "no assignment at all"); *Bowman v. Burlington N., Inc.,* 645 S.W.2d 9, 11 (Mo.App.1982). The purpose of a motion for new trial is to give the circuit court the opportunity to correct its own errors without appellate court intervention. *State ex rel. McNutt v. Northup,* 367 S.W.2d 512, 514 (Mo.1963); Rule 78.07(a).

Rule 78.04 requires that all motions for new trial be filed not later than 30 days after the entry of judgment. "A motion for new trial may not be amended to add a new point after the expiration of the time provided by court rule." *Blunkall v. Heavy and Specialized Haulers, Inc.,* 398 S.W.3d 534, 548 (Mo.App.2013); *Greco v. Robinson,* 747 S.W.2d 730, 734 (Mo.App.1988); *see also Lloyd v. Garren,* 366 S.W.2d 341, 344 (Mo.1963) ("These amended motions for a new trial and to set aside verdict are a nullity because they were filed out of time, and they cannot be the foundation for the preservation of errors to be complained of on appeal.").

Missouri courts strictly apply the rule that allegations of error must be stated specifically in the context of juror nondisclosure. In *Heinen v. Healthline Mgmt., Inc.,* the defendant in a wrongful death case filed a motion for a new trial after the jury returned a verdict for the plaintiff, alleging that eight jurors intentionally failed to disclose personal lawsuits during voir dire. 982 S.W.2d 244, 246 (Mo. banc 1998). In its motion, the defendants alleged, "'There was intentional juror misconduct through the concealment of suits as follows:' and then listed the suits." *Id.* at 248. This Court held that the defendant's allegation preserved only the issue of undisclosed lawsuits and did not preserve the issue of undisclosed claims for personal injuries that did not lead to lawsuits. *Id.* at 248–49. This was true despite the defendant's attempts to present evidence at a post-trial hearing regarding the allegedly undisclosed claims. *Id.*

In *Lohsandt v. Burke,* the court of appeals held that an allegation that "members of the jury failed to answer inquiries on voir dire to the prejudice of plaintiff" was a "general allegation that is not sufficiently definite to direct the court's attention to the particular acts asserted to be

erroneous." 772 S.W.2d 759, 760 (Mo.App. 1989). In *Shields v. Freightliner of Joplin, Inc.*, a case with a similar fact pattern to that presented here, the plaintiffs filed a motion for new trial alleging that a juror had failed to disclose: 1) that two orders of protection had been entered against him, and 2) that he knew or recognized one of the witnesses. 334 S.W.3d 685, 689 (Mo. App.2011). During a hearing on the motion, the juror was asked whether he failed to disclose any mechanical training he had that may have been relevant to the lawsuit. *Id.* at 690. The defendant objected, claiming the issue could not be considered because it had not been included in the motion for new trial and that counsel was unprepared to address it due to the lack of notice. *Id.* The court of appeals held that, because the issue of the juror's mechanical training was not included in the motion for new trial, it was not preserved for appellate review. *Id.* at 695. The fact that it was raised at the hearing did not change the analysis. *Id.*

During voir dire, the Smiths asked a number of questions to determine whether any jurors had family members with lung problems. The Smiths argue, on appeal, that these questions were designed to elicit whether any panel member had biases and prejudices against tobacco litigation. Therefore, the Smiths argue, the statement in their motion for new trial that "several jurors held strong biases against and predetermined views of tobacco litigation" and "did not disclose these biases and prejudices during voir dire" was sufficient to preserve the issue for review and bring the issue to the attention of the circuit court.

This statement, however, does not adequately meet the specificity requirement of Rule 78.07. This statement could encompass nearly any question the Smiths asked during voir dire. The very purpose of asking questions at all is to ferret out venire members who have a predetermined bias against one party or the other. To preserve the nondisclosure of a family member's illness for review, that claim must be clearly stated in the motion for new trial. It is insufficient to preserve such a claim by simply alleging in a motion for new trial that jurors failed to disclose biases against tobacco litigation. *See Heinen*, 982 S.W.2d at 248; Rule 78.07.

■ The Smiths also claim that the circuit court erred in refusing to allow them to present evidence that Juror M failed to disclose his mother's COPD. Under Rule 78.07, with a few exceptions, all allegations of error must be properly presented in a motion for new trial to be preserved for appellate review. For purposes of this rule, to say that an allegation of error in a motion for new trial is not preserved for review is the same as to say that same allegation of error was not properly before the circuit court. If an allegation of error is not timely presented in a motion for new trial, then that allegation is never properly before the circuit court and, therefore, not preserved for review. The first mention in the record of Juror M's failure to disclose his mother's illness was at the hearing on the motion for new trial. The circuit court held that hearing nearly three months after the deadline to file the motion for new trial. Even assuming that the Smiths could have amended their motion by presentation of evidence, such an amendment was untimely when the hearing was conducted. The claim that Juror M failed to disclose his mother's COPD was, therefore, never properly before the circuit court, and the circuit court did not err when it excluded Juror T's testimony related to this allegation of error.

## Juror M's Failure to Disclose His Belief that Tobacco Litigation is Frivolous

The next question to decide is whether the circuit court properly excluded testimony from Juror T that Juror M stated throughout the trial that he thought the Smiths' lawsuit was frivolous.[7] "It is a well-founded and long-established rule, based on sound public policy, ... that the affidavit or testimony of a juror is inadmissible and is not to be received in evidence for the purpose of impeaching the verdict of a jury." *Wingate by Carlisle v. Lester E. Cox Med. Ctr.*, 853 S.W.2d 912, 916 (Mo. banc 1993). "The rule extends to juror conduct either inside or outside the juror room." *Id.* " 'A juror who has reached his conclusions on the basis of evidence presented for his consideration may not have his mental processes and innermost thoughts put on a slide for examination under the judicial microscope.' " *Fleshner*, 304 S.W.3d at 87. A juror may not testify concerning matters inherent in the verdict, such as "that the juror did not understand the law as contained in the court's instructions, or that he did not join in the verdict, or that he voted a certain way due to a misconception of the evidence, or misunderstood the statements of a witness, or was mistaken in his calculations, or other matters 'resting alone in the juror's breast.' " *Baumle v. Smith*, 420 S.W.2d 341, 348 (Mo.1967). Two policy considerations require the exclusion of this type of testimony. "First, there would be no end to litigation if verdicts could be set aside because one juror reportedly did not correctly understand the law or accurately weigh the evidence. Second, there is no legitimate way to corroborate or refute the mental process of a particular juror." *Fleshner*, 304 S.W.3d at 87–88 (citations omitted); *Baumle*, 420 S.W.2d at 348.[8]

The testimony that the circuit court excluded was precisely the type of evidence that violates this rule. This Court's decision in *Wingate* is particularly on point. In *Wingate*, a plaintiff moved for a new trial, alleging that one of the jurors failed to disclose a longstanding bias against lawsuits. 853 S.W.2d at 916. At the post-trial hearing, the plaintiff introduced deposition testimony from three alternate jurors and three jurors not joining the verdict, testimony from a trial consultant who had interviewed the allegedly biased juror after the trial, and testimony from the allegedly biased juror. *Id.* This Court held that the depositions of the other jurors were inadmissible because they included comments made by the allegedly biased juror during the trial's recesses and deliberations, and impeached the verdict. *Id.* This Court held that the testimony of the trial consultant and the allegedly biased juror was admissible because it concerned the allegedly biased juror's thoughts about lawsuits generally but did not inquire into statements made during the course of the trial. *Id.*

The Smiths argue that the rule is inapplicable here for two reasons: 1) be-

---

7. The Smiths' motion for new trial alleged that several jurors "believed that tobacco litigation was frivolous but did not disclose such opinions during jury selection despite clear questions that should have prompted a response." B & W does not dispute that this alleged nondisclosure was specifically pleaded in the motion for a new trial and properly preserved for review.

8. This Court has recognized two narrow exceptions to this rule, though neither is relevant here. Jurors may testify about juror misconduct when a juror gathers extrinsic evidence and brings that evidence back into the court room. *Fleshner*, 304 S.W.3d at 88. Jurors also may testify about statements reflecting ethnic or religious bias made by a juror during deliberations. *Id.* at 89.

cause ·decisions of this Court state that a movant alleging juror misconduct during voir dire must present evidence of misconduct, and 2) because the rule is limited to statements made during deliberations or inside the jury room. Both of these arguments are without merit. First, the cases cited by the Smiths do indeed support the proposition that the movant must present evidence to prove its claims, and they state that one way to do so is to present evidence from a juror. *See State v. Mayes,* 63 S.W.3d 615, 625–26 (Mo. banc 2001). But no case controverts the rule prohibiting juror testimony that impeaches the verdict. It is entirely appropriate to permit testimony of an allegedly biased juror to prove that the juror has a particular bias. *See Wingate,* 853 S.W.2d at 916. It is inappropriate, however, to do so by inquiring as to what the juror said or thought about the merits of the case during the course of the trial. In *State v. Edmonds,* cited by the Smiths, the court of appeals explicitly said, "Appellant mistakenly relies upon the testimony of Juror S to claim bias on the part of Juror P." 188 S.W.3d 119, 123 (Mo.App.2006). In addition to the policy concerns noted previously, one issue inherent in such testimony is that it is not particularly probative of the biases a juror had about the case *prior* to hearing evidence. It is one thing to inquire as to whether a juror thinks that all litigation of a certain type is frivolous—a perfectly permissible line of inquiry. It is another thing entirely to present evidence of what one juror said to other jurors about a case after the jurors have heard some or all of the evidence. Therefore, while the Smiths are correct that juror misconduct may be proved by juror testimony, they are incorrect when they assert that the mere fact that a juror may testify means the juror may testify about matters inherent in the verdict.

Second, the Smiths offer no authority that supports their contention that a juror may testify about statements of other jurors made outside of deliberations or the jury room. For this proposition, the Smiths cite language from *Edmonds.* The court of appeals in *Edmonds* stated, "Appellant may not use the testimony of a fellow juror to attack the claimed bias of a juror based upon statements made within the jury room." 188 S.W.3d at 123. The Smiths claim that this statement supports the conclusion that only statements made in the jury room are inadmissible. The rule, however, is that an affidavit or testimony of a juror is inadmissible to impeach the jury's verdict regardless of where it occurs. *Wingate,* 853 S.W.2d at 916 ("The rule extends to juror conduct either inside or outside the juror room."). The rule against allowing juror testimony to impeach the verdict is designed to prohibit testimony regarding a juror's thought process or motives. *Fleshner,* 304 S.W.3d at 87; *Baumle,* 420 S.W.2d at 348. This rule's purpose would be drastically undermined if testimony was allowed concerning anything one juror said to another so long as the comments were not made during deliberations or within the confines of the jury room. Therefore, any testimony regarding the thought process or feelings of any juror violates the rule and is inadmissible to prove juror misconduct.[9]

9. This statement should be qualified by the understanding that this Court has expressly permitted exceptions to this rule, which are set out in footnote 8 above. This Court's opinion here does not serve to nullify any of these exceptions. Those exceptions do not apply here, and this statement is made to clarify that the rule against testimony impeaching the verdict does not stop simply because the juror expresses his thoughts about the case to another juror outside the jury room doors.

The Smiths attempted to introduce testimony from Juror T that Juror M had expressed his belief that the lawsuit was frivolous. The testimony in the offer of proof demonstrates that Juror T would have testified that, on several occasions outside of deliberations, Juror M stated that he felt the lawsuit was frivolous. All of these statements came after the trial had already begun. This testimony reflects Juror M's motives and thought process and is, therefore, inadmissible to impeach the verdict.

 The final question to determine is whether the Smiths presented sufficient evidence to prove that Juror M was biased against tobacco litigation and failed to disclose this bias during voir dire. Intentional nondisclosure occurs if: 1) there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and 2) the prospective juror actually remembers the experience or that it was of such significance that his purported forgetfulness is unreasonable. *Williams,* 736 S.W.2d at 36. "Nondisclosure occurs only after a party asks a clear question." *Wingate,* 853 S.W.2d at 916. If a juror's thoughts are the same as his voir dire answer, then "he has disclosed everything that the voir dire question requires and no nondisclosure of any kind occurred." *Id.* at 916–17. "The determination of nondisclosure is left to the discretion of the trial judge whose ruling is disturbed only by showing abuse of discretion." *Id.; Williams,* 736 S.W.2d at 36.

The parties do not dispute that clear questions were asked regarding whether the jurors thought tobacco litigation was frivolous, nor do they dispute that these questions should have prompted a response from Juror M, had he harbored such a bias. The dispute revolves around whether the Smiths proved the alleged bias. The only admissible evidence presented regarding the Smiths' allegation of error is testimony from Juror M that he did not think the case was frivolous during voir dire. He testified, quite to the contrary, that he thought that the case was "interesting." This evidence is insufficient to prove that Juror M failed to disclose a bias against tobacco litigation. Moreover, even if Juror T's testimony was admissible, the Smiths' evidence would have been insufficient. At best, Juror T's testimony demonstrates that Juror M felt that the case was frivolous after the case had already begun. Juror T could not remember when Juror M started to say the case was frivolous but noted that it would have been after voir dire. This testimony does not show that Juror M was biased against tobacco litigation *at the time of voir dire.* Therefore, the circuit court did not abuse its discretion in overruling the Smiths' motion for new trial.

### Conclusion

Because the court of appeals' mandate in *Smith I* did not address any issues concerning what evidence could be presented at the retrial of punitive damages, and because the circuit court did not err in overruling the Smiths' motion for new trial or B & W's motion for judgment notwithstanding the verdict, the circuit court's judgment is affirmed.

RUSSELL, C.J., BRECKENRIDGE, DRAPER, WILSON and TEITELMAN, JJ., concur.

STITH, J., not participating.